## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

**IN RE: TAMRA JEWEL PROTAN,**

        **Debtor.**


**MOUWAFAK GHANNAM,**
**HANAN GHANNAM, and**
**F.O.G., INC.,**

                **Appellants,**

**v.**                                       **CIVIL ACTION 2:11-cv-0057**
                                                 **BANKRUPTCY NO. 08-20179**
                                                 **ADVERSARY NO. 08-2049**

**ARTHUR STANDISH, Trustee of the**
**Bankruptcy Estate of Tamra Jewel**
**Protan,**

                **Appellee.**


## MEMORANDUM OPINION AND ORDER

Appellants-Defendants Mouwafak Ghannam, Hanan Ghannam, and F.O.G., Inc. seek review of the September 15, 2010, final decision of the Bankruptcy Court granting judgment in favor of Arthur  Standish, Bankruptcy Trustee of the Estate of Tamra Jewel Protan.  (Docket 2, item 105.)[1] Because the Bankruptcy Court did not err, the Court **AFFIRMS** the judgment of the Bankruptcy Court and **DISMISSES** this appeal. [Docket 1.]

---

[1] Unless otherwise stated, Docket references pertain to the docket in this appeal and not the adversary proceeding number 08-2049.  References to the transcripts of testimony taken in the adversary proceeding, unless otherwise noted, are indicated by the date of the testimony as "Tr. ___."

*I. BACKGROUND*

This matter involves rancorous litigation arising from the breakdown of a marriage nearly six years ago. The issues at the heart of this matter have embroiled numerous courts for half a dozen years with a variety of issues including: a Chapter 7 bankruptcy proceeding and three attendant adversary proceedings; a state court domestic violence magistrate case; an eviction proceeding; a commercial contract dispute; and a divorce proceeding.

Defendant Mouwafak Ghannam, a retired physician, is married to Defendant Hanan Ghannam. (together "Defendants Ghannam"). (Docket 10 at 1959.)[2] The couple has four adult children, one of whom, Hassan Ghannam, was formerly married to Tamra Jewel Protan, the Debtor in the main bankruptcy case (Bankr. No. 08-20179). Defendant F.O.G., Inc. (F.O.G.) is a closely-held real estate company owned by Defendants Ghannam and their children. *Id.* at 1822. The acronym stands for "Family of Ghannam." Defendant Mouwafak Ghannam is the president of F.O.G. (*Id.* at 1820.) His son, Hassan Ghannam, was actively involved in Defendant F.O.G.'s affairs. Hassan Ghannam ran the Center-O-Town, the family's car wash business, and managed other F.O.G. real estate holdings. (Docket 10 at 1887.) The question of whether Hassan Ghannam was employed and compensated by Defendant F.O.G. or his father for this work was the subject of much inquiry in both the bankruptcy and family law court proceedings.

The narrative of this case begins on April 8, 1997, with Hassan Ghannam's purchase of a river front house located at 5320 Kanawha Avenue, Kanawha City, West Virginia. Hassan Ghannam

---

[2] Unless otherwise noted, the facts set forth herein were established during the course of the trial and hearings in the bankruptcy court adversary proceeding (Bankr. No. 08-AP-2049) brought by bankruptcy trustee Arthur Standish against Defendants Mouwafak and Hanan Ghannam, and F.O.G., Inc.

paid $280,000 for the house and his father, Defendant Mouwafak Ghannam (sometimes "Defendant Dr. Ghannam"), co-signed a deed of trust for the property.

About the same time that Hassan Ghannam bought the Kanawha Avenue house he began dating Tamra Jewel Protan ("Ms. Protan") (Tr. at 174-75.)  The couple married on June 24, 2000, and over the course of the next four years had three children together. (*Id.* at 172; Docket 10 at 1897.)

   *A.  The June 23, 2000, Prenuptial Agreement*

On June 23, 2000, the day before their wedding, Ms. Protan and Hassan Ghannam signed a prenuptial agreement.  (Docket 11 at 2123-31.)  It states that the parties intend to be married on June 24, 2000, and that both parties "have acknowledged their right to obtain separate counsel to review the terms of this agreement and have done so." (*Id.*)  Ms. Protan was twenty-five years old, and Hassan Ghannam was twenty-six at the time the agreement was executed. (*Id.*)  More particularly, the agreement states that in anticipation of the marriage, the parties:

> [D]esire to fix and determine by premarital agreement the rights and claims that will accrue to each of them in the estate and property owned by the other prior to this anticipated marriage, which rights and claims would otherwise accrue to each of them by reason of marriage, and to accept the provisions of this agreement in lieu of and in full discharge, settlement, and satisfaction of all such rights and claims and specifically set forth certain rights and claims demanded by Prospective Husband of Prospective Wife; and claims demanded by Prospective Wife of Prospective Husband.

> WHEREAS, each party has had an opportunity to thoroughly review each provision of this premarital agreement, and each party being fully advised of all rights and obligations which, in the absence of this premarital agreement, would rise:

>     (a)     upon the parties' marriage, and
>     (b)     upon the termination of the marriage by death, and
>     (c)     upon the termination of the marriage by operation of law

3

and each party being fully advised of the manner in which such rights and obligations are modified by this premarital agreement; and

- The Prospective Husband's real estate and rental properties, and it is agreed by the parties hereto that any appreciation in the value of this separate property during the marriage shall not be hereinafter classified as marital property. That in the event any indebtedness or decrease in the value of said real estate and rental properties should occur, the Prospective Husband likewise agrees now and forever to indemnify and save the Prospective Wife harmless from any decrease in said value or increase in any and all debts related therewith;

- The Prospective Wife specifically waives, now and hereafter, any right to make an accounting, inspection, review, discovery of any financial documents, accounts receivable or other fixed or [sic] assets of the Prospective Husband's business, recognizing the same will now and forever hereafter, regardless of the increase or decrease in value, be the sole and separate property of the Prospective Husband;

- The Prosective Husband's ownership in any real estate purchased solely in the name of the Prospective Husband, now and hereafter, regardless of the source of the funds used to purchase said real estate or to curtail any indebtedness that may be existent thereon;

- Any and all items of personal property that may be hereafter titles [sic] in Prospective Husband's name and any bills of sale or other evidences of purchase of said personal property in Prospective Husband's name shall likewise remain his separate property.

The Prospective Wife claims as her separate property the following assets:

- The Prospective Wife desires to retain as her separate property and all interests she may have in her business and real estate and rental properties, and it is agreed by the parties hereto that any appreciation in the value of this separate property during the marriage shall not be hereinafter classified as marital property. That in the event any indebtedness or decrease in value of said real estate and rental properties should occur, the Prospective Wife likewise agrees now and forever to indemnify and save the Prospective Husband harmless from any decrease in said value or increase in any and all debts related therewith;

4

- The Prospective Husband specifically waives, now and hereafter, any right to make an accounting, inspection, review, discovery of any financial documents, accounts receivable or other fixed assets of the Prospective Wife's business, real estate and rental properties, recognizing the same will now and forever hereafter, regardless of the increase or decrease in value, be the sole and separate property of the Prospective Wife;

- The Prospective Wife's ownership in any real estate purchased solely in the name of the Prospective Wife, now and hereafter, regardless of the source of the funds used to purchase said real estate or to curtail any indebtedness that may be existent thereon;

- Any and all items of personal property that my [sic] be here hereafter titles [sic] in Prospective Wife's name and any bills of sale or other evidences of purchase of said personal property in Prospective Wife's name shall likewise remain her separate property;

- Parties shall have (6) months to add to or subtract from this agreement as needed.

WHEREAS, the parties hereto have been advised by their respective counsel that Shank v. Shank, 387 S.E.2d 325 (1989), evidence the law in the State of West Virginia with respect to passive appreciation of separate property and active appreciation of separate property, the respective parties hereto have had explained to them that the West Virginia law, as it currently exists, will classify active appreciation in separate property as marital property which the Court subjects to equitable distribution, however, the parties hereto, recognizing that each, now and hereafter, desires to retain their separate properties, and each party hereto fully intends to continue appreciation in the value of their respective separate properties regardless of the source of monies ingested therein and specifically waive any claim to said active appreciation now and hereafter; and

WHEREAS, Prospective Wife and Prospective Husband hereby agree that they each, now and forever, waive any claim for alimony, support, maintenance, pendente lite support or maintenance, temporary support or other form of monetary remuneration intended to be a periodic payment, a lump sum payment, or any other payment used in the daily maintenance of their lives and understand that said waiver is forever; and

WHEREAS, neither party hereto has made any representations or warranties to the other party other than those representations or warranties as is set forth and prescribed in this Antenuptial Agreement.

5

In the event any court or other judicial forum should find that any particular paragraph embodied herein to be invalid, then in the event, [sic] said paragraph would be determined to be invalid, it shall not affect the validity of any and all other provisions and paragraphs embodied within this agreement.

In the event either party hereto decides to convey, devise or will any portions of each party's separate estate to the other, then said voluntary devise and conveyance shall be permitted and subsequently recognized valid in addition to the terms and conditions of this Antenuptial Agreement.

In the event either of the parties hereto shall at any time after the execution of this document make any claim or attempt in any jurisdiction or forum to have any of the terms, conditions and covenants embodied in this Agreement set aside and held for naught, the party attempting to set aside said terms, conditions and covenants shall be responsible to pay all of the other party's legal costs and attorney fees expended in attempting to maintain the integrity of the terms, conditions and covenants set out herein.

The provisions contained in this agreement represent the entire understanding between Prospective Husband and Prospective Wife pertaining to the respective "property" and marital property rights.

This agreement shall inure to the benefit of and shall be binding upon the heirs, executors, and administrators of the parties.

This agreement shall be considered to be executed and governed and construed under the laws of the State of West Virginia.

(*Id.* at 2123-2131.)

The prenuptial agreement is verified, bears the signatures of Ms. Protan and Hassan Ghannam and is acknowledged by a notary public. (*Id.* at 2127-28.)  The verification reads:

I [sic], Hassan Ghannam and Tamra Protan have requested the firm of John R. Mitchell, L.C. to prepare the attached Mutual Antenuptial Agreement within (48) forty-eight hours of anticipated marriage.

We both recognize that the contents are not complete and the firm of John R. Mitchell, L.C. is unfamiliar with all formal requirements of a [sic] antenuptial agreement. . [sic] after first being duly sworn, do hereby affirm and state that I am the plaintiff in the foregoing answers to defendant's discovery requests, state that the

facts and allegations therein contained are true, except insofar as they are herein stated to be on information, I believe them to be true.[3]

(*Id.* at 2130.)

Following the notary public's affidavit is a one-page, untitled document that is typed in a font that differs from the font used in the agreement. *Id.* at 2131. This document, which bears the same notary stamp that appears on the notary's affidavit, lists five items:

1. FOG, Inc. Shares of properties and investments;
2. House on 5320 Kanawha Avenue, Charleston, West Virginia;
3. Pension plan of Hassan Ghannam;
4. Buffington property in Huntington, West Virginia; and
5. Center of Town business.

(*Id.* at 2131.)

On June 23, 2000, the day before their wedding, Ms. Protan and Mr. Ghannam executed the foregoing prenuptial agreement. The agreement was drafted by John Mitchell, Sr., a Charleston, West Virginia, attorney. (Docket 11 at 2123-31.)

At trial, the witness testimony regarding the agreement sharply conflicted. Ms. Protan testified that it was Dr. Ghannam who first raised the subject of the prenuptial agreement, and he did so about three weeks before the wedding. (Document 10 at 1892.) Ms. Protan admitted that she and her fiancé discussed the subject and that they both understood that the purpose of the agreement was to protect the couple's separate assets and possible inheritances. (*Id.* at 1903.) Prior to executing the agreement, Ms. Protan's father, her grandfather, her fiancé, and she met with attorney, John Mitchell, Sr. (*Id.* at 1907.) On June 23, 2000, the day of the rehearsal dinner party, Ms. Protan spoke

---

[3] Mr. Mitchell testified that he was "fairly sure" that he did not proofread the prenuptial agreement and that the model for this verification was obviously taken from a form used in a civil case.(Docket 11-3 at 2264.)

with her fiancé and his mother, Defendant Hanan Ghannam. One or both of them advised her that if she did not go to John Mitchell's law office and sign the prenuptial agreement, then Dr. Ghannam would not attend the rehearsal dinner party and/or the wedding, and he would not let his wife and some of Ms. Protan's bridesmaids attend. (*Id.* at 1894.) (Ms. Protan's bridesmaids included Defendants' daughters and the daughters of some of Dr. and Mrs. Ghannam's friends.) Ms. Protan testified that Mrs. Ghannam also emphasized that Ms. Protan's reluctance to sign the prenuptial had caused her son Hassan Ghannam a lot of stress. (*Id.*) Consequently, Ms. Protan went to John Mitchell's office by herself and signed the agreement "at the front door." (*Id.* at 1895.) Ms. Protan denied seeing the one-page list of properties owned by Hassan Ghannam that was purportedly attached as an exhibit to the agreement at the time she signed it. (*Id.* at 1896.)

Hassan Ghannam testified that the subject of the prenuptial agreement arose well before the wedding, when he and Ms. Protan were first contemplating marriage. (Nov. 19, 2009, Tr. at 174.) He stated that Ms. Protan agreed that a prenuptial agreement would be a good idea but that she became reluctant after they were engaged. (*Id.* at 174, 177.) Hassan told Ms. Protan that if she did not want to sign the agreement, she did not have to; they would still get married. (*Id.* at 175.) The couple agreed to use John Mitchell as the attorney because he was a friend of both families and "everybody was comfortable with him." (*Id.*) Hassan Ghannam, accompanied by his mother, Defendant Hanan Ghannam, and Ms. Protan, accompanied by her grandfather, met with John Mitchell the day before the wedding and discussed "the issues, the exact details [of] what we needed to be put in the prenuptial agreement." (*Id.*) Hassan recalled that, on June 23, 2000, the day of the rehearsal dinner party, Ms. Protan ran out of gas on her way to Mr. Mitchell's office and was in a rush because "she had to do her hair and her nails and everything." (*Id.* at 178.) He stated that Ms.

8

Protan was not hesitant about signing the agreement. (*Id.*)  Ms. Protan knew that Hassan did not care whether she signed the agreement but Hassan admitted that his parents might not have attended the rehearsal dinner party or wedding if Ms. Protan refused to sign. (*Id.* at 178.)  Hassan claimed that the list of five assets he owned was attached to the prenuptial agreement at the time it was signed and that the list was prepared by John Mitchell. (*Id.* at 177 & 205.)   No values were stated for these assets. (*Id.* at 204.)  No similar list for Ms. Protan was attached because "she did not have any property," Mr. Ghannam testified. (*Id.* at 206.)

Defendant Hanan Ghannam testified that she accompanied her son, Ms. Protan, and Ms. Protan's grandfather to Mr. Mitchell's law office the day before the wedding.  (Docket 10 at 1782-83.)  At first she testified that she might have "possibly" had a conversation with Ms. Protan about not attending the wedding festivities if Ms. Protan did not sign the prenuptial agreement, but  Mrs. Ghannam ultimately denied making this statement to her future daughter-in-law. (*Id.*)

Defendant Dr. Mouwafak Ghannam testified he "never had any involvement or argument or discussion" about the prenuptial agreement with Ms. Protan or his son.  (Docket 11 at 1809.)  Dr. Ghannam denied attending any meetings at Mr. Mitchell's office regarding the prenuptial agreement, but he stated that he was friends with Mr. Mitchell and was in his office every week. (*Id.* at 1810.)

Finally, John Mitchell testified.  He stated that he told Ms. Protan and Hassan Ghannam, as well as the couple's parents, that he did not routinely practice domestic relations law, had not practiced in the area for many years, and was not knowledgeable about prenuptial agreements. (Docket 11-3 at 2266.)  The couple was only in his office twice. (*Id.* at 2273.)  Mr. Mitchell was surprised by their visit because the couple did not have an appointment. (*Id.* 2269.)  He said his office calendar showed that Ms. Protan, her father, and Mr. Ghannam came into his office on June

9

22, 2000. (*Id.* at 2272.) On June 23, 2000, Ms. Protan, Hassan Ghannam, and his parents returned to John Mitchell's office. (*Id.*) The couple signed the agreement that day. (*Id.*) Mr. Mitchell told Ms. Protan and Hassan Ghannam that because he knew both families, he did not want to be involved with the prenuptial agreement, and Mitchell advised them to find another lawyer. (*Id.*) He told the couple he was "not competent in the field." (*Id.* at 2273.) Mr. Mitchell testified, "I wasn't too sure what I was doing myself . . . and that's why really I didn't want to do it . . . I shouldn't have done it." (*Id*. at 2273.) Mr. Mitchell used a form agreement that he obtained from "somebody who did a lot of domestic work . . . they sent it over." (*Id.* at 2271.) When asked what his understanding was of one of the provisions of the agreement, Mr. Mitchell stated

> I didn't read it to them. I would have read it to them and explained it to them if I had been here at the time of execution. I probably was not even aware of the wording because it's legalese, and I took it undoubtably from the form that I had.

(*Id.* at 2273.) Mr. Mitchell did not review any of the language with Ms. Protan and Mr. Ghannam. (*Id.*) He did not recall the list of assets attached to the agreement but speculated that Defendant Dr. Ghannam probably gave it to him. (*Id.* at 2270.) He stated that the font used to type the list of assets was not the font his office used. (*Id.* at 2270)("In fact, it's not off my machines. Obviously someone brought it in here.") Mr. Mitchell stated he did not discuss with Ms. Protan or Hassan Ghannam the value of the assets listed on the attachment to the prenuptial. (*Id.* at 2272.) He stated that he did not know why there would not have been an equivalent listing for Ms. Protan. Because the agreement did not refer to the attachment, Mr. Mitchell considered the list of Mr. Ghannam's assets a "fugitive paper." (*Id.* at 2272.)

B.    The Marriage and Finances

Following their wedding in June 2000, Ms. Protan and Mr. Ghannam had three sons, all of whom were under the age of six at the time of the break-up of the marriage in late 2005. The couple lived in the Kanawha Avenue house and undertook substantial renovation to the home, including constructing an addition that tripled its original size. Based on appraisals made in the course of litigation, the house was estimated to be worth $620,600 in 2009. (November 19, 2009, Tr. at 36.) Following the death of her father in December 2001, Ms. Protan inherited approximately $280,000. (Docket 10 at 1954-55.) The evidence at trial conflicted on the amount of money the couple each contributed to the renovations. Ms. Protan gave extensive and detailed testimony that she used her inheritance monies to assist in paying for the renovations to the home. (*Id.* at 1854-81.)

In the summer of 2003, the couple started a day care center, the Discovery Learning Center, on premises leased from Defendant F.O.G.,the Ghannam family's closely-held real estate corporation. (*Id.* at 1816, 1991-94.) The building had previously been a chiropractic office and required substantial renovation to convert into a day care center. (*Id.* at 1817.) Defendant Dr. Ghannam testified that he did not charge Ms. Protan and his son rent the first three or four months, and that he contributed somewhere between $60,000 to $80,000 to the construction costs. (*Id.*) Ms. Protan testified that she and her former husband repaid Dr. Ghannam these funds by paying Defendants Ghannam's daughter's college tuition. (*Id.* at 1921.) Ms. Protan further testified that she used at least $120,000 of her inheritance to renovate the facility. Defendant Dr. Ghannam testified that initially F.O.G. charged Ms. Protan and Mr. Ghannam $5,000 per month rent and later adjusted the rent to $5,300. (*Id.*) The lease agreement is dated April 1, 2003, and purports to run for a five-year term. (Docket 11 at 2019-20.) Defendant Dr. Ghannam did not dispute that the signature on the

11

lease was not Ms. Protan's. (Docket 10 at 1982.)  Dr. Ghannam speculated that his son Hassan

Ghannam probably signed Ms. Protan's name. (*Id.*)  Ms. Protan testified that she did not know about

the written lease agreement at the time she started the day care center.  (Docket 11 at 2019, 2026.)

She stated that she and her former husband, acting on behalf of F.O.G., purchased the building that

would later house the day care center.  (*Id.* at 2023.)  Ms. Protan further stated that she made the

improvements to the property because she believed the building was property owned by her and her

husband. (*Id.* at 2022-25.)

Other evidence demonstrated that in early December 2003, Ms. Protan loaned Defendant Dr.

Ghannam $32,000 from her inheritance so that he could pay taxes. (Docket 10 at 1824-25, 1882-84.)

Evidence in the record conflicted as to whether this debt was repaid to Ms. Protan.  Dr. Ghannam

testified that he handed Ms. Protan a check dated April 21, 2004, in the amount of $33,000.  (*Id.* at

1826.)  Ms. Protan testified that was not true.  Evidence showed that a check for $33,000 was

deposited in Ms. Protan's and Mr. Ghannam's joint checking account, but that it was Hassan

Ghannam who endorsed the check and spent the monies. (*Id.* at 1948-51.)  Ms. Protan testified that

she was not aware of the deposit until years later at a deposition in connection with the bankruptcy

proceedings. (*Id.* at 1883.)

C.      *State Court Civil Litigation*

By the latter half of 2005, the couple's marriage was falling apart .  In September 2005,

Hassan Ghannam signed over the deed to the Kanawha Avenue house to his parents although he

continued to live in the home along with Ms. Protan and their three young children.  At the time, Ms.

Protan was not aware of this transfer of title.  By November 2005, Mr. Ghannam had transferred

ownership of approximately two million dollars in assets to his father.  The Defendants Ghannam paid their son nothing for the house.

On December 8, 2005, Ms. Protan obtained an emergency domestic violence protection order from Kanawha County Magistrate Court. (Docket 11-1 at 2166-76.)   In her petition, Ms. Protan alleged that Hassan Ghannam was mentally unbalanced, he had repeatedly threatened her, and she feared for the safety of herself and her children.  (*Id.* at 2169-71.)  The state court awarded possession of the house to Ms. Protan and ordered Mr. Ghannam to continue to make mortgage payments and pay the utilities pending resolution of the case.  (*Id.* at 2177.)

Beginning in late November 2005 and continuing through January 2008, Defendant F.O.G., by its then President, Defendant Hanan Ghannam, sent a series of dunning letters to Ms. Protan demanding payment for back taxes and rent purportedly owed by Ms. Protan "as owner of Discovery Learning Center . . . in accordance to our lease agreement."[4]  (Docket 11 at 2151-65.)  On January 9, 2006, Ms. Protan and Mr. Ghannam appeared for a final hearing on the domestic violence petition. (Docket 11-1 at 2178.)  The court found that Ms. Protan had proven her allegations and entered a final protective order restraining Hassan Ghannam from having any contact with Ms. Protan. (*Id*. at 2179.)  The court awarded temporary custody of the children to Ms. Protan. (*Id.*)  The court also ordered Hassan Ghannam to continue to pay the mortgage plus utilities for the marital home. (*Id.* at 2177, 2180.)  A notation in the court's order provided that "psychiatric issues may need [to be] addressed."  (*Id.* at 2178.)

---

[4]  The Court notes that the font used in these letters is identical to the font used in the one-page listing of assets attached to the prenuptial agreement, a list which Defendant Dr. Ghannam and Hassan Ghannam claimed was prepared by John Mitchell, Sr.  Mr. Mitchell testified that his office did not prepare the listing.

On January 26, 2006, Mr. Ghannam filed for divorce in state family law court.  (Docket 10 at 1760.)   In the summer of 2006, Defendant Dr. Ghannam initiated eviction proceedings in magistrate court seeking to evict Ms. Protan and their grandchildren from the marital home. (*Id.*) On June 6, 2006, a family law judge issued a writ of prohibition staying any further actions in the eviction proceedings.  (*Id.*)  On January 29, 2007, Mr. Ghannam filed a motion in the divorce proceedings seeking enforcement of the prenuptial agreement.  (*Id.* at 1761.)   In May 2007, Defendant F.O.G. sued Ms. Protan in state court seeking to terminate the day care center lease.  (*Id.* at 1765.)  In July 2006, Ms Protan initiated an action against Hassan Ghannam in which she sought an emergency stay of foreclosure.  (Docket 10 at 1764.)  The state court dismissed the action in deference to the state family law court proceeding.

On March 4, 2008, the couple's divorce was granted, but the family law court proceedings continued with respect to the couple's financial issues. (*Id.*)  At a hearing in April 2009, Mr. Ghannam gave sworn testimony that he was unemployed, had no income, and could not pay child support.  In February 2010, the family law court found, after taking evidence, that during the years of his marriage and afterward Defendant Dr. Ghannam supplied his son with all his living expenses. The court also found that Mr. Ghannam conveyed all his assets to either his father or F.O.G., "as he was not sure."  The court credited the testimony of Ms. Protan, finding that during her marriage, Mr. Ghannam "ran F.O.G." and that Mr. Ghannam would bring home rolls of one hundred dollar bills from the car wash and stow the cash away in an upstairs closet of the marital home.  The court also determined that Defendant Dr. Ghannam paid third-parties for his son's debts instead of paying Mr. Ghannam for the work he performed for F.O.G.   The court specifically noted that Mr. Ghannam's conveyance of the marital home to his father "remains the subject of an action which is pending in

14

the U.S. Bankruptcy Court for the Southern District of West Virginia." The court also noted that it had reviewed excerpts from the bankruptcy proceedings and those documents "fully support the [family law court's] findings and conclusions." The family law court then ordered that Mr. Ghannam pay child support in the amount of $2,890.46 per month, that he provide medical insurance covering the children, and that he pay 87% of any uncovered medical and dental costs.

  D. *Bankruptcy Proceedings*

  The same day that the divorce was granted, March 4, 2008, Ms. Protan filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. (Docket 10 at 1709.) Defendants and their son, Hassan Ghannam, appeared as creditors in the proceedings. On March 7, 2008, Defendant F.O.G. filed a motion seeking an order declaring that the day care lease agreement terminated. (*Id.* at 1710.) Defendant F.O.G. also sought to lift the automatic stay on the day care center property. (*Id.*) On April 17, 2008, Ms. Protan initiated an adversary proceeding against Defendant F.O.G. seeking a declaratory judgment that Ms. Protan effectively renewed the lease for the day care center. (Bankr. No. 2:08-AP-02027, Docket 1.) That adversary proceeding was closed on September 22, 2008, based on agreement by the parties whereby Ms. Protan agreed to vacate the day care center premises and pay F.O.G. approximately $21,000. (*Id.* at 6.)

  On June 10, 2008, Defendants Dr. and Mrs. Ghannam initiated an adversary proceeding against Ms. Protan seeking possession of the Kanawha Avenue marital home. (Bankr. No. 2:08-AP-02040, Docket 1). In their complaint Defendants Ghannam alleged that their adversary proceeding was a core proceeding pursuant to 28 U.S.C. 157(b). (*Id.*) The Defendants also alleged that they were the owners of the Kanawha Avenue house and that Ms. Protan and their son lived in the house in the fall of 2005 with Defendants' permission. (*Id.*) The complaint further claimed that

Ms. Protan and Mr. Ghannam agreed to pay specified mortgage and rent payments as well as taxes, insurance, and utilities for the home. (*Id.*) The complaint also stated that after Mr. Ghannam "vacated" the house on December 8, 2005,  Ms. Protan "failed and refused to make any additional payments of rent for her occupancy" of the house and "had no right to possession of the property." (*Id.*)  The complaint alleged that Ms. Protan was in arrears of  a total of more than $131,000.  (*Id.*)

On July 29, 2008, Arthur Standish, the United States Bankruptcy Trustee in Ms. Protan's Chapter 7 case, initiated an adversary proceeding against Defendants Ghannam  seeking avoidance of the September 20, 2005, deed transaction that transferred title of the Kanawha Avenue home to Defendants Dr. and Mrs. Ghannam.  The Trustee's complaint also sought repayment of Ms. Protan's $32,000 loan to Defendant Dr. Ghannam.  The Trustee subsequently amended his complaint  adding Defendant F.O.G. and an unjust enrichment claim.

On October 14, 2008, some three months after the Trustee filed his initial complaint, Defendants Dr. and Mrs. Ghannam moved to stay the proceedings in the Trustee's action pending the family law court's determination of the validity of Ms. Protan's and Mr. Ghannam's  prenuptial agreement.  The Trustee objected.  The next day, by agreed order, Ms. Protan and Defendants Ghannam agreed to stay their adversary proceeding (Bankr. No. 08-AP-2040).  The reason for that stay was because the issues contested in the Trustee's adversary proceeding against Defendants Ghannam and F.O.G. (Bankr. No. 08-AP-2049) were identical to those in dispute in the Ghannam's adversary proceeding, that is, ownership of the Kanawha Avenue house.  Thereafter, over the course of the following year, the parties conducted discovery, including taking a deposition of attorney John Mitchell, Sr.

16

On November 19, 2009, at the beginning of the trial in the Trustee's action, the following colloquy between Defendants' counsel, the bankruptcy judge, and Ms. Protan's counsel occurred:

**Mr. Horter [Defendant's counsel]:**  The only thing I would ask Your Honor is just one more time, I would renew my motion for this court to abstain from this matter, because, again, the defendants, as I stated before when we had this hearing before, I think what this court is going to be required to do is classify this asset as being separate property or marital property; then [sic] is going to have to determine the value of the separate properties; and then divide the properties should—should we reach that point.

Again, from our trial brief, you can see our position is that the Ghannams obtained this property not under—not under fraud, but through the operations of a prenuptial agreement that—that Hassan Ghannam and Tamra Protan entered into the day before their wedding. That issue and the issues of the division of the marital property are still before the Family Law Court in Kanawha County, West Virginia, and we believe that's where—that's why we asked this court to abstain from asserting jurisdiction at this time, allowing the Family Law Court to make the determination of the validity of the prenuptial agreement, and then have those findings be brought to this court for further proceedings.

We believe that the prenuptial agreement is at the heart of our defense in this case, that Ms. Protan and subsequently the bankruptcy estate did not have any interest in this house, the 5320 Kanawha Avenue house, that is part of this proceeding, one of the counts. And, therefore, if that would be the case and the court would so find, then there would be no fraudulent transfer.

Again, we believe that that's more properly in front of the family law master for two reasons. Number one is their experience in dealing with this type of—these type of cases. Number two, one of the parties to that prenuptial agreement is not a party in this case, and that's Hassan Ghannam. Again, we believe that the Ghannams' rights to this property flow through him and subsequent, and, therefore, through the prenuptial agreement.

**THE COURT**: The problem is we don't have the trustee—we don't have the trustee's action and the trustee's rights legitimately and have no way to get the trustee's rights before the family law master, do we? I mean, I can't abstain from matters that are asserted to be core. And at this point in time, it appears to me that— that's where we are is with—with the proceedings here that have been asserted to be core, that we must presume to be core now, and that we've got a responsibility to resolve. Because the trustee's avoidance power under the West Virginia Fraudulent Conveyance Act goes back five years that permits the trustee [sic] is not something that is in issue or can be put in issue in a state proceeding, or we could abstain. That's

17

the problem we have with that—I think we've talked about this in the past and I don't know how to do it. Believe you me, we looked.

**MR. HORTER**: Well, that would be my suggestion, is that we just take findings from the family law master, bring them back here, and then the court can rule based upon those findings without the necessity of hearing and taking evidence in this court.

**MR. CAGLE [Ms. Protan's counsel]**: Judge, we filed a motion in response to a motion to that and that was the law of the case, and consequently we're prepared to go forward.

**THE COURT**: I think we're here and I do think that it is our responsibility to try to get this resolved for all parties' interest, including the trustee's and the creditors that

Ms. Protan has, and so, we would decline that request.

(Nov. 19, 2009, Tr. at 16-18.)

Thereafter, and continuing through the next day, the court heard evidence from several witnesses, including Ms. Protan, her former husband, Hassan Ghannam, and Dr. and Mrs. Ghannam. Additional evidence was taken on June 22, 2009.  (Docket 10 at 1937-2007, Docket 11 at 2008-82.)

On December 8, 2009, the bankruptcy court entered an order invalidating the prenuptial agreement.  (Docket 11-1 at 2213-16.)  On September 15, 2010, the bankruptcy court entered a fourteen-page judgment order containing detailed findings of fact and conclusions of law.  The court found in favor of the Trustee on all counts.  On September 24, 2010, the court entered a corrected judgment order (which remedied a mathematical error in the earlier judgment order) and awarded a total of $322,400 in favor of the Trustee.  The order also awarded pre-judgment interest and attorneys' fees.

On December 20, 2010, the court denied Defendants' motion for reconsideration.  On December 28, 2010, Defendants filed their notice of appeal.

*II. LEGAL STANDARDS*

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158.  The bankruptcy court's jurisdiction was predicated on 28 U.S.C. § 1334 and 11 U.S.C. §§ 105, 548 and 544(b).  It is a core matter under 28 U.S.C. § 157(b)(2)(A), (B), (G) and (H). Additionally, venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. § 1409.

In an appeal from a bankruptcy proceeding, a district court reviews the legal conclusions of the bankruptcy court de novo and any factual findings for clear error.  *In re Nieves*, 648 F.3d 232, 237 (4th Cir. 2011) (stating that in an appeal from a bankruptcy proceeding, the court of appeals applies the same standard of review that the district court applied when it reviewed the bankruptcy court's decision, that is, the legal conclusions of both the district court and the bankruptcy court are reviewed de novo and the factual findings of the bankruptcy court are reviewed for clear error).

A bankruptcy court's abstention from asserting jurisdiction under 28 U.S.C. § 1334(c)(1) is discretionary and is therefore reviewed under an abuse of discretion standard. *Dennis v. Bank United*, Nos. RWT 10 cv 3147, RWT 10 cv 3151 &52, 2011 WL 4024814, at *2 (D. Md. Sept. 9, 2011)(citing *In re: Eastport Assoc.*, 935 F.2d 1071, 1075 (9th Cir. 1991) (decision relating to abstention "under § 1334(c)(1) is reviewed for an abuse of discretion.").

Under 29 U.S.C. § 158(a)(1), the Court has jurisdiction over appeals from "final judgments, orders, and decrees" of bankruptcy judges.  "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013.

19

*III. DISCUSSION*

In this appeal, Defendants make six assertions of error.  Viewing the evidence in the light most favorable to the Trustee, the Court finds that the bankruptcy court did not err.

A. *Bankruptcy Judge Did Not Abuse His Discretion in Denying Defendants' Motion to Stay and Motion to Abstain*

(*1*) *Applicable Law*

Title 28, United States Code, section 1334 vests United States district courts with exclusive and original jurisdiction of all cases under the Bankruptcy Code, 11 U.S.C. § 101 *et seq*.  District courts have original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in or related to a case under Title 11. 28 U.S.C. § 1334(b).  Also, a district court in which a bankruptcy case is commenced or is pending has exclusive jurisdiction of  "all the property, wherever located, of the debtor as of the commencement of the case, and of property of the estate." *Id.* § 1334(e)(1).

The purpose of § 1334 is to centralize proceedings in the bankruptcy court.  *In re PRS Insur. Grp, Inc.*, 335 B.R. 77, 83 (Bankr. D. Del. 2005).  By enacting § 1334, "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal effectively and expeditiously with all matters connected with the bankruptcy estate." *Id.*  Section 1334(b) is "'primarily an expansion of the bankruptcy courts' jurisdiction rather than an avenue for state courts to address issues traditionally within the realm of the bankruptcy courts.'" *Id.* (quoting *Halas v. Platek*, 239 B.R. 784, 792-93 (Bankr. N.D. Ill. 1999).  Where facts that form the basis for state court claims  "strike at the heart of the administration of the bankruptcy estate," the bankruptcy court has a "predominant interest in regulating the conduct of those involved in the bankruptcy proceedings,"

and any exercise of concurrent jurisdiction by a state court may be prohibited. *Lowenbraun v. Canary*, No. 04-627, 2005 U.S. Dist. LEXIS 10401, at * 5-6 (W.D. Ky.  May 27, 2005).

Title 11, United States Code, section 544 empowers a bankruptcy trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b).  This section is commonly used to avoid, under state law, fraudulent transfers from the Debtor's estate.

In addition to avoiding fraudulent transfers, the bankruptcy trustee is allowed to recover for the benefit of the estate avoidable property, or the value of such property, from "the initial transferee" or  any subsequent transferee.  11 U.S.C. § 550(a)(1).  Any immediate or subsequent transferee, however, has an affirmative defense to recovery if such transferee "takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided." *Id.* § 550(b)(1). Upon a showing by the trustee that a party is a transferee, a defendant claiming a defense to liability under § 550(b) bears the burden of proof.  *In re Smoot*, 265 B.R. 128, 140 (Bankr. E.D. Va. 1999).

Pursuant to 28 U.S.C. § 157(b)(1), bankruptcy judges may hear and determine all cases under Title 11, as well as all core proceedings arising under Title 11, or arising in a case under Title 11. Examples of proceedings that are "core" are listed in § 157(b)(2) and include "matters concerning the administration of the estate," "allowance and disallowance of claims against the estate," "motions to terminate, annul or modify the automatic stay," and "proceedings to determine, avoid, or recover fraudulent transfers."  28 U.S.C. § 157(b)(2)(A), (B), (G) & (H).

Title 28, United States Code, Section 1334(c) grants courts the power to abstain from hearing a particular proceeding.  That section provides:

 (c)(1) Except with respect to a case under chapter 15 of title 11, nothing in this
section prevents a district court in the interest of justice, or in the interest of comity

with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

"Arising under" proceedings are those proceedings where the cause of action is created by Title 11.

*In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61, 68 (1st Cir. 2002). In contrast, "related to" proceedings are proceedings that " potentially have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate." *Id.* (internal quotations omitted). Proceedings that "arise in" and "arise under" define the bankruptcy court's "core" jurisdiction. *Concerto Software, Inc. v. Vitaquest Intern., Inc.*, 290 B.R. 448, 452 (Bankr. D. Me. 2003). "Related to" proceedings fall within the court's "non-core" jurisdiction. *Id.*

   *(2) Analysis*

  Defendants frame their first issue as follows: "Did 28 U.S.C. § 1334(c)(2) strip the U.S. Bankruptcy Court of jurisdiction to resolve property disputes between Tamra Jewel Protan, her husband, and Appellants/Defendants, which were already before the Family Law Court in and for Kanawha County, West Virginia." (Docket 7 at 1068.)

  The Defendants argue that because they "timely invoked the mandatory abstention provisions of 28 U.S.C. § 1334(c)(2), the U.S. Bankruptcy Court lacked jurisdiction." (*Id.* at 1095.) Utilizing the multi-factored analysis for mandatory abstention determinations, they claim that the property disputes at issue in the bankruptcy proceedings (and specifically the prenuptial agreement) "were

22

already pending, and ripe for decision" before the family law court. (*Id.*)  They assert that: (1) "they invoked mandatory abstention" in a timely fashion; (2) the Trustee's fraudulent transfer action sounds in state law;( 3) the "September 30, 2005 transfer [of title of the Kanawha Avenue house] did not involve a core proceeding in the March 4, 2008 bankruptcy proceeding of Protan"; (4) the bankruptcy court had no independent ground for federal jurisdiction over the 2005 transfer of the house or of Mr. Ghannam's stock in F.O.G.; (5) the divorce proceeding preceded the filing of the bankruptcy petition; (6) the divorce proceeding "could have been timely adjudicated"; and (7) the family law court was an appropriate jurisdiction. (*Id.* at 1096-98.)

In response, the Trustee argues that the state family law court "would not likely permit either the Trustee's claim or the Ghannams' claims to proceed in Family Court." (Docket 15 at 2307.)  He does not contest Defendants' reliance on mandatory abstention analysis.  The Trustee states that the Defendants did not even attempt to intervene in the family law case; rather, they invoked the jurisdiction of the bankruptcy court by initiating an adversary proceeding (Bankr. No. 08-AP-2040) through which they sought, among other things, summary eviction of their former daughter-in-law and their grandchildren from the Kanawha Avenue house.  (*Id.* at 2308.)  The Trustee further contends that no state action between the Defendants and Ms. Protan was pending in state court and, thus, could not be timely adjudicated.  He also claims that family law courts are courts of limited jurisdiction and would not be authorized to decide property disputes between Ms. Protan and the Defendants. (*Id.*)

Defendants' argument is frivolous. At the outset, Defendants claim that they "timely invoked the mandatory abstention provisions" of § 1334(c)(2) bears scrutiny.  Defendants' never filed a motion for mandatory abstention in this case.  Rather, on October 14, 2008, some three months after

the filing of the Trustee's original complaint, Defendants filed a "Motion for Stay of Adversarial Proceedings." Citing several cases, Defendants argued that bankruptcy courts should "defer to Family Courts regarding ownership issues of marital property." While Defendants quoted a brief passage from a Delaware bankruptcy court case that referenced the permissive abstention provision of 28 U.S.C. § 1334(c)(1), nowhere in the page and a half of argument did Defendants reference § 1334(c)(2)'s mandatory abstention provision or otherwise argue that abstention was mandatory. Nor did Defendants, in their reply to the Trustee's objection to their motion, argue that abstention was mandatory. That omission is notable in that the Trustee's memorandum characterized Defendants' motion as an abstention motion and specifically cited 28 U.S.C. § 1334(c)(2). Moreover, while Defendants' counsel advised the bankruptcy court at the beginning of the first day of trial (November 19, 2009) that he wanted "to renew [his] motion for this court to abstain from this matter," Defendants do not point to any other place in the record where they presented the bankruptcy judge a fair opportunity to consider this position.[5] There is no evidence that at any time after filing their October 2008 motion to stay Defendants sought a hearing on the motion. Rather, it appears that the only time defense counsel argued his position to the bankruptcy court was moments before the trial was to begin. That tactic placed the bankruptcy court in an unfair and difficult position.

---

[5] Indeed, review of this case has been hampered by the parties failure to designate specific pertinent portions of the record as required by Fed. R. Bank. P. 8006. Rather, in their January 13, 2011, Rule 8006 designation, Defendants designated "the entire record below as the record on appeal." In light of the voluminous record in this case, such a blanket designation is unhelpful. Moreover, Defendants' failure in their briefs to cite specific portions of the record to support their factual assertions and arguments required sifting through several thousands of pages of the record, an unnecessary waste of this Court's resources. By analogy, Local Rule of Civil Procedure 9.4(b) requires that, in cases appealed from the Commissioner of Social Security's final decision, "[t]he statement of facts . . . cite by transcript page number to the evidence on which the plaintiff relies."

24

The Court need not decide whether Defendants have waived their mandatory abstention argument or failed to move for abstention in a timely fashion because it is readily apparent that abstention was not mandatory in this case.   Pursuant to 28 U.S.C. § 157(b)(1), bankruptcy judges may hear and determine all cases under Title 11, as well as all core proceedings arising under or arising in Title 11 cases.   The Trustee's adversary proceeding was a core proceeding because, as provided by §157(b)(2), it concerned "matters concerning the administration of the estate," "allowance and disallowance of claims against the estate," "motions to terminate, annul or modify the automatic stay," and, perhaps most importantly, "proceedings to determine, avoid, or recover fraudulent transfers."   28 U.S.C. § 157(b)(2)(A), (B), (G) & (H).   The mandatory abstention provision contained in § 1334(c)(2) applies only to non-core or "related to" proceedings. Defendants' argument that "the September 20, 2005 transfer did not involve a core proceeding in the March 4, 2008 bankruptcy proceeding of Protan" is meritless and at best reflects a flawed understanding of the statute.

Notwithstanding the inapplicability of § 1334(c)(2), it appears that at the November 19, 2009, hearing, the bankruptcy judge may have misapprehended his discretion to abstain under § 1334(c)(1). The "permissive abstention" provision permits a court to abstain "in the interest of justice, or in the interest of comity with State courts or respect for State law . . . from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1).   Thus, a bankruptcy court has discretion to abstain from core proceedings if abstention would serve the interests of justice, comity with state courts or out of respect for state law.   Thus, to the extent the bankruptcy court may have believed it lacked discretion to abstain because the Trustee's action was

25

a core proceeding, that belief was erroneous; however, for the reasons that follow, the Court finds any error harmless.[6]

Abstention is an "extraordinary and narrow exception" to the federal court's solemn obligation to adjudicate matters within its proper jurisdiction. *Cnty. of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188-89 (1959). The Supreme Court has identified six factors that bear on the question of whether a court should abstain where there are concurrent state and federal court proceedings: (1) convenience of the federal forum; (2) avoidance of piecemeal litigation; (3) the order in which the courts obtained jurisdiction; (4) whether either court has assumed jurisdiction over property; (5) the source of law for decision; and (6) whether the state court can adequately protect the rights of the party seeking federal jurisdiction. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814-15 (1976); *Moses H. Cone Mem. Hosp.*, 460 U.S. at 19-27(1983).

In *In re Robbins*, 964 F.2d 342, 344 (4th Cir. 1992), the Fourth Circuit found that a bankruptcy court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied. It noted the following factors that courts consider in deciding whether to lift the automatic stay: (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy

---

[6] Defendants have not raised this issue and, as such, have forfeited the argument.

court. *Id.* (citing *In re Mac Donald*, 755 F.2d 715, 717 (9th Cir. 1985); *In re Holtkamp*, 669 F.2d 505, 508-09 (7th Cir. 1982); *In re Revco D.S., Inc.*, 99 B.R. 768, 776-77 (Bankr. N.D. Ohio 1989); *In re Pro Football Weekly, Inc.*, 60 B.R. 824, 826-27 (Bankr. N.D. Ill.1986); *Broadhurst v. Steamtronics Corp.*, 48 B.R. 801, 802-03 (Bankr. D. Conn. 1985). The Fourth Circuit also noted that while "Congress intended the automatic stay to have broad application, the legislative history to section 362 clearly indicates Congress' recognition that the stay should be lifted in appropriate circumstances." *Id.*

Bankruptcy courts have considered a number of factors when analyzing the discretionary abstention decision. *See, e.g.*, *In re Titan Energy, Inc.*, 837 F.2d 325, 333 (8th Cir. 1988) (finding pertinent the questions of whether the action could have commenced in federal court absent bankruptcy jurisdiction and whether the issues can be timely adjudicated in state court); *In re Earle Indus., Inc.*, 72 B.R. 131, 133-34 (Bankr. E.D. Pa.1987) (finding pertinent the question whether unsettled issues of law exist and whether there are concerns of case administration and judicial economy); *In re Boughton*, 60 B.R. 377, 383 (Bankr. S.D. Tex. 1986)(finding pertinent the question of whether the outcome of the proposed litigation will have any effect on the estate).

Finally, one court has observed that "[t]he concept of discretionary abstention involves a determination by the bankruptcy court as to whether or not issues raised in the pending state court action implicate bankruptcy principles which might have a material bearing on the debtor's reorganizational efforts." *In re Texaco, Inc.*, 77 B.R. 433, 438 (Bankr. S.D.N.Y.1987). No single factor is necessarily determinative, and a court should carefully balance all of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. *Moses H. Cone Mem. Hosp.*, 460 U.S. at 16.

With these guiding principles in mind, it is apparent that any error by the bankruptcy court is harmless because its refusal to abstain under the facts of this case was an appropriate decision. Several reasons support that conclusion.  First, the federal bankruptcy forum was the most convenient and sensible forum to sort through the web of issues percolating throughout this case. Defendants and their son littered their litigation throughout several different state courts.  When Ms. Protan sought refuge in bankruptcy from crushing and insurmountable debt (much of which appears to be related to medical bills and transactions involving Defendants and her former husband), Defendants and Hassan Ghannam quickly availed themselves of the bankruptcy court's jurisdiction by filing claims as creditors.  Moreover, Defendants, in an effort to evict Ms. Protan and her children from the Kanawha Avenue house, directly invoked the bankruptcy court's jurisdiction over that claim by initiating their own adversary proceeding against Ms. Protan. (Bankr. No. 08-AP-2040.)

Additionally, as noted by the bankruptcy judge at the November 19, 2009, trial, the family law court was not a forum where the Trustee's rights could be adjudicated.  The bankruptcy forum was the only forum where Defendants Ghannam were parties and creditors, where Ms. Protan and the Trustee were parties, and where Mr. Ghannam was a creditor.[7]

Also, as the Trustee argued in the bankruptcy proceedings, staying the Trustee's action would endanger the estate.  In light of ample evidence of suspect financial and other transactions, the Trustee was rightly concerned that the Defendants, who held fee simple title to the Kanawha Avenue

---

[7]   Equity prevents recognition of any complaint by Mr. Hassan Ghannam (and there is no complaint asserted) that his interests vis-á-vis the Kanawha Avenue house were not represented in the bankruptcy proceedings.  Any such complaint is meritless in light of Mr. Ghannam's repeated disavowals in both the bankruptcy and the family law courts of having any ownership interest in the property after his transfer of title to his parents in September 2005.

property, "could easily dispose of the Residence by sale to a bona fide purchaser for value at any time." Additionally, the principal, if not sole, source of payment for the creditors' claims was the value of Ms. Protan's share in the Kanawha Avenue house and the other assets that Mr. Ghannam transferred to his father. The Trustee's determination of the estate's interest in these assets was the paramount concern in the entire bankruptcy proceeding. These facts "strike at the heart of the administration of the bankruptcy estate," and clearly the bankruptcy court had "a predominant interest in regulating the conduct of those involved in the bankruptcy proceedings." *See Lowenbraun,* 2005 U.S. Dist. LEXIS at *5-6. Finally, as noted by the Trustee in his brief, no other state action was pending at the time Ms. Protan filed her bankruptcy petition where the interests of the Trustee, Defendants, and Ms. Protan were represented.

Defendants correctly assert that the divorce suit preceded the bankruptcy proceedings. This is a relevant factor because it may bear on whether the state court is able to address the issues before it in a timely fashion. It is also relevant because the decision when to file for bankruptcy might demonstrate forum-shopping on the part of the debtor. As noted above, however, the family law proceeding was not a proceeding where the Trustee or the Defendants were parties. As such, no other relevant proceeding was pending at the time of the bankruptcy petition. Further, in light of the extensive record demonstrating Defendants' concerted and aggressive litigation history with Ms. Protan, the Court is convinced that the reason Ms. Protan filed for bankruptcy was not because she was forum-shopping, but rather because she was broke. This conclusion is fully corroborated by the family law court's child support order. That order, in stern and certain terms, made clear that the court had serious questions about Hassan's Ghannam's credibility and with the myriad financial and

other shenanigans in which he and his family engaged. Stated differently, the family law court was not a forum that would cause Ms. Protan to want to shop around for a better setting.

Next, the question of whether the courts had assumed jurisdiction over the property is relevant. A district court in which a bankruptcy case is commenced or is pending has exclusive jurisdiction of "all the property, wherever located, of the debtor as of the commencement of the case, and of property of the estate." 28 U.S.C. § 1334(e)(1). Because § 1334(e)(1) granted the bankruptcy court exclusive jurisdiction of "all" of Ms. Protan's property when she filed her bankruptcy petition, it is of little moment if and when any other court had jurisdiction over the property. The fact that Ms. Protan did not list the Kanawha Avenue house in her property schedules is also of little importance because it is the Trustee's interests in securing assets to satisfy creditors that matters.

The fact that the Trustee's fraudulent transfer and unpaid loan claims ultimately derive from West Virginia state law is also relevant. The Court, however, does not give this factor great weight because bankruptcy courts "regularly address and resolve complicated issues of state property law, even novel ones." *In re Driesenga*, No. DG 09-00925, 2010 WL 2105185, at *2 (Bankr. W.D. Mich. May 24, 2010); *see also In re Foster*, 105 B.R. 746, 750 (Bankr. M.D. Ga.1989) ("[b]ankruptcy courts routinely interpret state law in order to resolve disputes in bankruptcy cases.") (citing *In re Wilson*, 85 B.R. 722, 727 (Bankr. E.D. Pa. 1988.) Furthermore, while the litigation history here is complex, the state law issues were not, and the governing state law is well-settled and not complex.

Also, the Court is cognizant that bankruptcy courts generally should grant great deference to state courts in domestic matters. *See In re Robbins*, 964 F.2d at 344; *see also Caswell v. Lang*, 757 F.2d 608 (4th Cir. 1985). The Supreme Court, in *Marshall v. Marshall*, 547 U.S. 293 (2006), however, specifically addressed the scope of the so-called "domestic relations exceptions" and "the

probate exceptions" to federal jurisdiction.  In *Marshall*, federal jurisdiction in a Chapter 11 bankruptcy case was predicated on 28 U.S.C. § 1334.  *Id.* at 308.  In reviewing the jurisprudential origins of "the domestic relations exception," and Supreme Court precedent interpreting the exception, the Court stated that the domestic relations exception covers only "a narrow range of domestic relations issues."  *Id.* at 307 (citation omitted).  Concerned that some lower courts had applied the exception "well beyond" its intended circumscribed limits, the Court emphasized that the exception applies only to "divorce, alimony, and child support decrees" and that federal courts are "equally equipped to deal with complaints alleging the commission of torts."  *Id.* at 308.

Here, the domestic law issues that needed to be resolved were basic contract interpretation (prenuptial agreement), resolution of a statutory tort (fraudulent transfer), and an unpaid debt.  None of these issues required the bankruptcy court to grant a divorce, alimony or child support.  All of these issues fall regularly within the bread-and-butter work of a bankruptcy court and, thus, lie outside the scope of the "domestic relations exception" to federal jurisdiction.

> B.     *The Bankruptcy Judge Did Not Err by Invalidating the Debtor's Ante-Nuptial Contract*

Defendants' next claim of error is: "Whether the U.S. Bankruptcy Court erred in setting aside the prenuptial agreement of Tamara Jewel Protan and her husband, Hassan Ghannam." (Docket 7 at 1086.)  Defendants contend the court erred in making the following findings: (1) that the prenuptial agreement was entered into involuntarily; (2) that Ms. Protan was denied a reasonable opportunity to consult with counsel before signing the agreement; (3) that Ms. Protan was denied separate counsel from that of her husband; and (4) that "the purported failure to list any property was material." (Docket 7 at 1086, 1100.)

31

The Trustee contends that the bankruptcy court's findings were correct.  He emphasizes the various deficiencies in the language of the agreement, as well as Mr. Mitchell's disclaimer that the content of the agreement was not complete and that he was unfamiliar with all the formal requirements of a prenuptial agreement.  The Trustee also points to Ms. Protan's testimony that she did not recall seeing the list of assets when she signed the agreement.  (Docket 15 at 2309-11.)

The bankruptcy court's "Order Finding Antenuptial Agreement to be Void and Unenforceable" is a part of the record and has been reviewed. (Docket 2-45.)  To the extent Defendants contest the bankruptcy court's credibility determinations, that contention is rejected because this Court must give "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013.  Moreover, contrary to Defendants' contentions, it is readily apparent from the record that the bankruptcy court's findings are well-supported by the evidence and not clearly erroneous.  For example, the bankruptcy court's finding that Ms. Protan "was under considerable pressure from Defendant Mouwafak Ghannam" is amply supported by the evidence.  Defendant Dr. Ghannam's testimony that he "never had any involvement or argument or discussion discussing the prenuptial agreement" was belied by his son's testimony that his father might not have attended the rehearsal dinner party if Ms. Protan refused to sign the agreement.  Defendant Mrs. Hanan Ghannam's testimony on the question whether she ever told Ms. Protan that Dr. Ghannam would not come to the wedding festivities and would not allow her bridesmaids to come was inconsistent in that she first stated she "possibly" had such a conversation, and then denied any such conversation. Given the fact that the prenuptial agreement was signed the day before the wedding, coupled with the threat that her future in-laws would refuse to attend the

32

rehearsal dinner and wedding, the bankruptcy court's finding that Ms. Protan was acting under duress and her execution of the agreement was not voluntarily is amply supported by the evidence.

Similarly, the bankruptcy court's finding that Mr. Mitchell's deposition testimony supported the conclusion that the prenuptial agreement was invalid was not erroneous in any regard. The evidence that Mr. Mitchell did not provide competent legal advice to Ms. Protan is overwhelming. Mr. Mitchell expressly stated that he was not competent in the field of prenuptial agreements. Mr. Mitchell candidly testified that he did not routinely practice domestic relations law, had not practiced in the area for many years, and was not knowledgeable about prenuptial agreements. Contrary to Defendants' assertion that the agreement "has no omissions or errors in any respect whatsoever," the agreement is littered with errors. More importantly, the Court finds the circumstances surrounding the execution of the agreement—including the fact that Ms. Protan signed the agreement just hours before the rehearsal dinner party, the lack of separate counsel for the couple, the threats from Defendant Mrs. Ghannam, and Mr. Mitchell's frank acknowledgment that he was not competent in the area of prenuptial agreements—all support the unconscionability of enforcement of the contract. Where the bankruptcy court's factual finding were not erroneous in any respect and where it applied correct legal standards in making its findings, there is no error.

C.   *Bankruptcy Judge Did Not Err by Determining That the Fraudulent Transfer of Title to Debtor's Marital Residence to Defendant Dr. Ghannam Justified Damages to Debtor in the Amount of $170,400*

Defendants argue that the bankruptcy court's holding that the September 20, 2005 fraudulent transfer of title to the Kanawha Avenue house justified $170,400 in damages to Ms. Protan. He argues that Ms. Protan "was in arrears to Defendants Ghannam in the amount of $65,724 on June 10, 2008, and did not pay rent in the intervening months and years." (Docket 7 at 1110.) They also

contend that, assuming the invalidity of the prenuptial agreement, the bankruptcy court "grossly inflated" any interest Ms. Protan had in the property. *Id.*

The Trustee contends that Defendants are fortunate that a larger judgment was not entered. (Docket 15 at 2317.) He claims that the assertions that Defendants make in their brief have no basis in the record and is not supported by applicable law. (*Id.* at 2318.)

Defendants' argument is founded on a faulty premise, that is, it assumes Defendants Ghannam had a right to charge Ms. Protan and Hassan Ghannam rent for the home the couple lived in. Because the bankruptcy court found that the transfer of title to Defendants Ghannam was a fraudulent transfer, they were never Ms. Protan's or Hassan Ghannam's landlords. Furthermore, Defendants engage in mathematical gymnastics to arrive at the conclusion that the value of Ms. Protan's interest in the home was only $103,388 and not the $170,400 awarded by the bankruptcy court. As the Trustee points out, it was Defendants' burden to rebut the presumption that the improvements and other equity in the marital home were marital property under West Virginia state law. (Docket 15 at 2318.) The record supports the conclusion that Defendants failed to carry their burden in this regard.

The Court further observes that the bankruptcy court's detailed findings concerning the transfer of the Kanawha Avenue house are stated in the court's judgment order. Many of the factual findings are not and cannot be fairly contested here because they were established by Defendants' testimony and that of their son, Mr. Ghannam. To the extent that Defendants' disagree with the court's credibility determinations, the Court finds no reason to disturb those findings especially where such deference "is particularly appropriate on issues of fraudulent intent." *See In re White*, 128 Fed. App'x 994, 999 (4th Cir. 2005).

34

D.      *Bankruptcy Judge Did Not Err by Awarding $120,000 to Debtor Based on Capital Improvements She Made to Business Property She Leased from Defendants*

Defendants claim that when the bankruptcy court pierced Defendant F.O.G.'s corporate veil, the court erred in reaching more than the Hassan Ghannam's 25% interest in Defendant F.O.G. (Docket 7 at 1108.)   They claim that the $120,000 award to Ms. Protan was based on the erroneous assumption that Hassan Ghannam was the sole owner of Defendant F.O.G.  (*Id.* at 1109.)  They further argue that where the evidence showed that the company was "all along" Defendant Dr. Ghannam's, then there can be no marital claim to the property. (*Id.* at 1109.)  Finally, they contend that Ms. Protan had no viable claim against Defendant Dr. Ghannam for tortious interference with her day care business based on Defendants' refusal to renew the day care center lease. (*Id.*)

The Trustee responds by reciting evidence in the record.  (Docket 15 at 2314-15.)  He contends that the $120,000 judgment was predicated on a theory of unjust enrichment. (*Id.* at 2316.)

Defendants did not seriously contest the fact that Ms. Protan used $120,000 of her inheritance to improve the premises that housed the day care center.  The bankruptcy court's order made specific factual findings, none of which were erroneous, and concluded that if Defendants were allowed to keep the benefit of Ms. Protan's financial contributions to the property, they would be unjustly enriched.  Because the bankruptcy court applied the correct legal standards and because its factual findings were not erroneous, there is no error.

E.      *Bankruptcy Judge Did Not Err by Awarding $32,000 Based on the Finding that Defendant Had not Repaid a $32,000 Loan from Debtor*

Defendants argue that the court erred by finding that Defendant Dr. Ghannam had not repaid the $32,000 loan from Ms. Protan.  Ms. Protan testified that she loaned Dr. Ghannam $32,000.  She further testified that she was never repaid.  She refuted Dr. Ghannam's testimony that he handed her

a check for $32,000 and the bankruptcy court credited her testimony over Dr. Ghannam's. It is uncontested that Defendant Dr. Ghannam did write a check for $33,000. It is uncontested that Ms. Protan did not endorse the check and that her former husband did. Ms. Protan did not dispute evidence that the check was deposited into the couple's joint checking account. The court credited her testimony, however, that she did not deposit the check, was not informed about the deposit and the funds were spent by her former husband without her knowledge. Based on this evidence and on the court's finding that Mr. Ghannam fraudulently transferred to his father approximately $2.0 million in assets in the months preceding his divorce filing, there is no error in the bankruptcy court's ruling.

> ### F.   Bankruptcy Judge Did Not Err in Awarding Attorneys' Fees and Costs to Debtor and Trustee

Defendants' last contention is that the bankruptcy court erred in awarding attorneys' fees and costs. (Docket 7 at 1112.)

The Trustee responds that the various provisions of Title 11 of the Bankruptcy Code authorize compensation to the Trustee and, with the court's approval, to the attorney who represented the debtor. *See* 11 U.S.C. §§ 326-328.

The bankruptcy court awarded attorneys' fees to the Trustee and ordered him to file an invoice. (Docket 2-105.) This award was authorized by 11 U.S.C. §§ 326-328. There is no error.

*IV.  CONCLUSION*

Based on the record it is readily apparent that the Bankruptcy Court did not err. Thus, the

Court **AFFIRMS** the judgment of the Bankruptcy Court and **DISMISSES** this appeal. [Docket 1.]

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented party.

ENTER:          September 30, 2011

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE